IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| LARRY MOORE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )    No. 10-2933-AJT-tmp |
| | ) |
| UNIVERSITY OF MEMPHIS, | ) |
| SHIRLEY RAINES, RAJIV GROVER, | ) |
| RALPH FAUDREE, JR., | ) |
| | ) |
|     Defendants. | ) |

## REPORT AND RECOMMENDATION

Before the court by order of reference is Defendant University of Memphis's ("University") Motion for Summary Judgment, filed January 31, 2013.[1] (ECF No. 40.) Plaintiff Dr. Larry Moore filed a response in opposition to the motion on March 31, 2013, and the University filed a reply to Dr. Moore's response on April 12, 2013. For the following reasons, the court recommends that the motion be granted in part and denied in part.

### I. PROPOSED FINDINGS OF FACT

#### A. Background

---

[1]Dr. Shirley Raines, Dean Rajiv Grover, and Provost Ralph Faudree, Jr., also defendants to this action (collectively, "Individual Defendants"), filed a separate Motion for Summary Judgment on January 13, 2013. The merits of that motion are addressed in a separate Report and Recommendation.

Unless otherwise stated, the following facts are undisputed.[2] Dr. Larry Moore, who is African-American, is a licensed attorney who became employed by the University of Memphis in August 1987. (Defendants' Statement of Undisputed Facts ("DSUF") ¶ 1, ECF No. 41; First Offer Letter, Apr. 28, 1987, Ex. A, Bates Nos. U of M 285-86.) He was hired for a one-year, non-tenure track appointment at the rank of Assistant Professor of Business Law in the Department of Finance, Insurance and Real Estate. (Id.) In 1988, Dr. Moore was hired for a tenure track appointment in the same rank of Assistant Professor. (DSUF ¶ 2; Second Offer Letter, June 27, 1988, Ex. A, Bates No. U of M 291.) The position had a probationary period of five years, and reappointment each academic year was "subject to annual review of progress toward tenure," which involved an examination of evidence of accomplishments in the areas of research, teaching, and service. (Id.)

In the 1992-1993 academic year, Dr. Moore applied for tenure and promotion to the rank of Associate Professor. (DSUF ¶ 3; Letters from President V. Lane Rawlins and Provost J. Ivan Legg,

---

[2]In his response to the motion for summary judgment, Dr. Moore suggests that there is outstanding discovery that is needed to support his claims, but he does not identify the discovery he believes would be relevant, or to which claims the discovery would relate. The court notes that it has ruled on the motion to compel, and the Defendants have apparently produced the discovery ordered by the court. More importantly, Dr. Moore has not complied with Federal Rule of Civil Procedure 56(d), which requires an affidavit or declaration to support an assertion that additional discovery is needed prior to responding to a summary judgment motion.

Ex. A, Bates Nos. U of M 1264-67.)  Although he was not recommended for promotion at that time, his application for promotion and tenure was extended one year to allow him the opportunity to further develop his scholarly activity and research program.  (<u>Id.</u>) On June 24, 1994, the Tennessee Board of Regents awarded Dr. Moore tenure and promoted him to the rank of Associate Professor, effective September 1, 1994.  (DSUF ¶ 4; Letter from President Rawlins, July 15, 1994, Ex. A, Bates Nos. U of M 1256, 1258.)  In Spring 2002, Dr. Moore was moved, along with the other business law faculty, into the School of Accountancy.  (DSUF ¶ 5; Response to EEOC Charge of Discrimination, Ex. D, pg. 11.)

The Faculty Roles and Rewards Document for Fogelman College provides three areas of consideration for evaluation of a candidate who is applying for promotion in rank from Associate to Full Professor.  (DSUF ¶ 10; <u>Faculty Roles and Rewards Document</u>, Fogelman College of Business & Economics, Dec. 8, 2005, Ex. D, pgs. 13-16.)  These areas include: teaching, service, and "research and scholarly activity."  (<u>Id.</u>)  With respect to research and scholarly activity, the Faculty Roles and Rewards Document states an expectation of "a consistent flow of research activity, normally expected to result in an average of one publication per year since promotion to Associate [Professor]."  (DSUF ¶ 11; <u>Faculty Roles and Rewards Document</u>, Ex. D, pg. 15.)

In 2008, Dr. Moore applied for promotion from Associate

Professor to Full Professor in the School of Accountancy, but was not recommended for promotion. (DSUF ¶ 6; Letter from Provost Faudree, Jan. 15, 2009, Ex. A, Bates Nos. U of M 1234.) In a memorandum to Provost Ralph Faudree, Jr., dated November 24, 2008, Dr. Rajiv Grover, Dean of Fogelman College of Business and Economics, stated that "in evaluation of the totality of Professor Moore's accomplishments in teaching, research and scholarly activity, and service," Dr. Moore had not yet met the criteria for promotion to Full Professor, and that he (Dean Grover) would not recommend that Dr. Moore be promoted. (DSUF ¶ 31; Letter from Dean Grover, Ex. A, Bates Nos. 1144-45.) Provost Faudree sent a letter to Dr. Moore on January 15, 2009, stating that he (Provost Faudree) recommending Dr. Moore for promotion. (Letter from Provost Faudree, Bates No. U of M 1234.) According to the letter, Provost Faudree's decision to not recommend Dr. Moore for promotion was based on his "modest record of scholarly work and an inconsistent flow of research that builds upon the body of knowledge and gains national recognition."[3] (Id.)

Dr. Moore appealed Provost Faudree's decision to the University Faculty Tenure and Promotion Appeals Committee ("Appeals Committee"), on the grounds of racial discrimination and mistake or failure to review Dr. Moore's dossier application for promotion.

_____

[3]In Provost Faudree's letter, he acknowledges that Dr. Moore has contributed to the University "with substantial service and a solid teaching record." (Bates No. U of M 1234.)

(DSUF ¶ 9; Notice of Appeal Letter, Jan. 28, 2009, Ex. A, Bates No. U of M 1235.) The Appeals Committee met on March 5, 2009, to hear Dr. Moore's appeal of the Provost's negative recommendation.[4] (DSUF ¶ 12; Appeals Committee Memorandum, Mar. 6, 2009, Ex. A, Bates No. U of M 1139.) Present at the hearing, in addition to the five members of the Appeals Committee, were Dr. Moore, Provost Faudree, and Dean Grover. (Transcript of Appeals Committee Hearing, ECF No. 40-6, Ex. C.) Following the hearing, the Appeals Committee determined by unanimous vote that there was no evidence of unlawful discrimination based on race, and that there was no "evidence of a mistake in the review of [Dr. Moore's] dossier such that a reviewing body is unaware of a credential that satisfies a requirement for promotion". (Id.; Appeals Committee Memorandum, Ex. A, Bates No. U of M 1140.) According to the Appeals Committee, there was "no indication that discrimination on the basis of race or any other factor entered into the considerations leading to" Dr. Moore's negative recommendations for promotion, and "[a]ll indications are that the dossier provided to the Dean and the Provost was fully reviewed and that no credential was overlooked." (Id.)

After the Appeals Committee's findings were published, Dr. Shirley Raines, President of the University, met with Provost

---

[4]The Appeals Committee was composed of Professors Michael Cannito, Ebenezer George, Carl Halford, Ronnie Priest, and Jon Tienson (Chair). (Bates No. U of M 1139.)

Faudree to review Dr. Moore's application for promotion. (DSUF ¶ 13; Raines's Dep., Ex. E, pg. 31-33.) Following her meeting with Provost Faudree, President Raines accepted the recommendations of Provost Faudree and Dean Grover. (Id.) On April 30, 2009, President Raines notified Dr. Moore that she would not recommend him to the Tennessee Board of Regents for promotion to Full Professor. (DSUF ¶ 14; Letter from President Raines, Apr. 30, 2009, Bates No. U of M 1236.)

On August 12, 2009, Dr. Moore filed a Title VII race discrimination charge against the University with the Equal Employment Opportunity Commission ("EEOC"). (DSUF ¶ 15; "Discrimination Charge," EEOC Charge No. 490-2009-02573, Ex. A, Bates No. U of M 1406.) In his Discrimination Charge, Dr. Moore claims that he was denied promotion to Full Professor by Dean Grover, Provost Faudree, and President Raines, and that white employees with less seniority and fewer accomplishments have been promoted to Full Professor. (Id.) Dr. Moore identifies Dr. Jerry Turner as a comparator who was promoted but had qualifications that were equal to or lesser than those of Dr. Moore. (Id.) Dr. Turner is a white professor in the School of Accountancy who was promoted from Associate to Full Professor in 2008 - the year before Dr. Moore's application for promotion was denied. (DSUF ¶ 21; Letters from Provost Faudree and President Raines, Ex. A, Bates Nos. U of M 1425-27.) Dr. Turner had been a tenured Associate Professor

since the 2003-2004 academic year prior to his promotion to Full Professor. (DSUF ¶ 34; Letters from President Raines, Ex. A, Bates Nos. 1426-27.) During the period of review for his application for promotion to Full Professor (from 2003 to 2008), Dr. Turner published a total of eight articles. (DSUF ¶ 19; Ex. A, Bates Nos. 1506, 1515, 1519, and 1523.)

Dr. Moore also claims in his Discrimination Charge that he has been subjected to unequal wages based on race, and he compares himself to two other Business Law professors: Dr. Irvin Tankersley and Dr. Nancy Mardis. (DSUF ¶ 15; Discrimination Charge, Ex. A, Bates No. U of M 1406.) Dr. Moore claims that Dr. Tankersley has published no papers, and that Dr. Mardis has only published one paper, yet both are paid a higher salary than him. (Id.) Dr. Tankersley was the only other full-time Business Law faculty member in the School of Accountancy, other than Dr. Moore, during the 2008-2009 academic year. (DSUF ¶ 7; Ex. D, pg. 3.) He is a white, male attorney who was hired by the University in 1973, and he is also a tenured, Associate Professor. (Id.) Dr. Tankersley's salary for the 2008-2009 and 2009-2010 academic years was $66,947, and Dr. Moore's salary was $54,097. (DSUF ¶¶ 23-24; School of Accountancy Faculty 2008-2009, Ex. A, Bates No. U of M 1136.) Dr. Mardis is a white female Business Law faculty member who retired in May 2008. (DSUF ¶ 25; Response to EEOC Charge of Discrimination, Ex. A, Bates Nos. U of M 1133-34.) Her salary for the 2007-2008

academic year was $55,058, and she would have earned the same salary for the 2008-2009 year had she not retired, as there were no salary increases for those years. (Id.)

Finally, Dr. Moore claims in his Discrimination Charge that he has been subjected to unequal terms and conditions of employment by being consistently assigned more classes and students to instruct, while white professors are assigned fewer classes and students but are compensated with greater pay and more promotions. (DSUF ¶ 15; Discrimination Charge, Ex. A, Bates No. U of M 1406.) Dr. Moore's class load for the 2008-2009 academic year was "9 and 9."[5] (DSUF ¶ 26; School of Accountancy Faculty Teaching Loads, Ex. A, Bates No. U of M 1137.) Dr. Tankersley's class load for the 2008-2009 academic year was also 9 and 9. (DSUF ¶ 27; School of Accountancy Faculty Teaching Loads, Ex. A, Bates No. U of M 1137.) During the 2000-2001 and 2001-2002 academic years, Dr. Moore's teaching load was 9 and 12. (DSUF ¶ 26; School of Accountancy Faculty Teaching Loads, Ex. A, Bates No. U of M 1137.) For each academic year between 2002 to the present, his class load has been 9 and 9.[6] (Id.)

_____

[5]"9 and 9" refers to the credit hours taught for the Fall and Spring semesters, respectively, of a given academic year.

[6]These teaching loads do not include hours taught in the summer. It appears from the record (specifically, from the Appeals Committee's hearing transcript and Dr. Moore's own assertions) that summer courses are optional for professors and serve as a source of additional income.

On September 27, 2010, Dr. Moore was issued a Notice of Right to Sue letter for his Discrimination Charge. (DSUF ¶ 16; Dismissal and Notice of Rights, Sept. 7, 2010, Ex. D, pg. 5.) On October 22, 2010, Charlene Spiceland, Assistant to the Director of the School of Accountancy, sent an email to Dr. Moore and Dr. Tankersley, advising them of a book change for all Business Law Spring 2011 classes. (DSUF ¶ 17; Spiceland Email, Ex. A, Bates No. U of M 1114-16.) The email stated that consistency was being instituted across courses, pursuant to both a college and university mandate, and that all sections of "ACCT 3130" would be using the new book. (Id.) On October 25, 2010, Dr. Moore filed a second EEOC charge against the University for retaliation. (DSUF ¶ 17; "Retaliation Charge," EEOC Charge No. 490-2011-00192, Ex. D, pg. 52.) In his Retaliation Charge, Dr. Moore claims that he was subjected to an unequal term and condition of employment in that Spiceland, a non-supervisory/management official, chose a textbook for him. (Id.) Dr. Moore asserts that he has never had textbooks chosen for him, that other professors did not have textbooks chosen for them, and that no professor in a specialized course (such as law) has ever had textbooks chosen for them. (Id.) Dr. Moore claims in his Retaliation Charge that "the University is denying [his] academic instructional freedom," and asserts his belief that the change in textbooks directive was an act of retaliation by the University for his filing the previous Discrimination Charge. (Id.) On March 29,

2011, the EEOC mailed Dr. Moore a Dismissal and Notice of Rights letter for his Retaliation Charge.[7]  (DSUF ¶ 32; <u>Dismissal and Notice of Rights</u>, Mar. 29, 2011, Ex. A, Bates No. U of M 1105.)

**B.  Complaint**

On December 26, 2010, Dr. Moore filed a complaint against the University, as well as "Individual Defendants" President Raines, Dean Grover, and Provost Faudree.  (Pl.'s Compl., ECF No. 1.)  In his complaint, Dr. Moore alleges several federal and state causes of action, including violations of Title VII of the Civil Rights Act of 1964 ("Title VII"); violations of federal civil rights statutes 42 U.S.C. §§ 1981 ("§ 1981 claim"), 1983 ("§ 1983 claim"), and 1985 ("§ 1985 claim"); denial of Equal Protection and Due Process as guaranteed by the Fourteenth Amendment; retaliation; conspiracy; false light; invasion of privacy; interference with contractual relations; intentional infliction of emotional distress; outrageous conduct; misrepresentation; reckless and negligent reporting; harassment; civil and criminal fraud; promissory fraud; slander; and libel.

Dr. Moore's allegations against the named Individual Defendants focus on his denial of promotion to Full Professor.  Dr. Moore claims that Dean Grover and Provost Faudree "deliberately and

---

[7]Paragraph 32 of the Defendants' Statement of Undisputed Facts states that the Right to Sue letter was issued on September 27, 2010.  However, this appears to be a typographical error, as the Retaliation Charge was not submitted to the EEOC until October 2010, and the cited document is stamped March 29, 2011.

intentionally violated several statutes and common law doctrines and laws" through their actions during the administrative appeal hearing on March 5, 2009. He claims that they "intentionally and/or recklessly reported, misrepresented, slandered, [and] libeled the plaintiff to the members of the Committee, who were all ultimately under defendant Faudree's direct supervision; they also harassed him, committed civil and criminal fraud against him, conspired to deprive the Plaintiff of his constitutionally protected statutory and Constitutional rights of equal protection, due process, equal employment opportunities, invaded his privacy and placed him in a false light, interfered with his right to contract equally and committed outrageous conduct and inflicted emotional distress upon him, all under color of law and authority." (Pl.'s Compl. ¶ 4.) Dr. Moore alleges that they falsely informed members of the Appeals Committee at the hearing that his application "lacked necessary endorsements in his (seven) recommendation letters when in fact, six past Presidents of the American Business Law Association/Academy of Legal Studies In Business did absolutely recommend him as well as his superior[.]" (Id. ¶ 7.) According to Dr. Moore, "this constitutes slander, civil and criminal fraud, reckless and negligent reporting, misrepresentation, false light, intentional infliction of emotional distress, outrageous conduct, interference with contractual relations and harassment, all under color of law and authority."

-11-

(Id.) Moreover, Dr. Moore claims that in a letter from Dean Grover to Provost Faudree on November 24, 2008, Dean Grover states that "the textbook that is co-authored by Professor Moore with Horizon Publications in 2008 appears to be a local adaptation of a textbook for which he has added his own content." (Id. ¶ 8.) Dr. Moore claims that this statement constitutes "at the very least invasion of privacy, false light, slander, libel, fraud, among others, all under the color of law and authority." (Id.) According to the complaint, President Raines "at all time[s] condoned, promoted and was aware of the discriminatory behavior of her Provost and Dean and of the ongoing Civil Rights Violations in the Fogelman College of Business[.]" (Id. ¶ 5.) Dr. Moore claims that due to the Defendants' acts and omissions, "adverse employment action was taken against the plaintiff in that he did not receive full professorship with attendant raise and benefits and disparate treatment[.]" (Id. ¶ 12.) He claims that the Defendants were in a position to correct the actions and omissions but did not, and that "the institution and Shirley Raines formally upheld all actions and omissions of the defendants, Grover and Faudree, Jr., in its internal processes perfunctorily and without real review or supervision, all under color of law and authority." (Id.)

In addition to his denial of promotion, Dr. Moore claims that he has been discriminated against by the University throughout his tenure at the school. Dr. Moore claims that "[d]uring the twenty-

three years he has been employed at the University of Memphis, Professor Moore has received disparate treatment; he is one of the lowest paid professors (if not the lowest paid non-adjunct professor) and receives almost the same salary he was given in 1987, despite receiving tenured status in 1994; other employees during this period of time received disparately greater salaries and, over time, greater raises, costs of living raises, better terms and conditions and benefits[.]" (<u>Id.</u> ¶ 6.) Dr. Moore asserts that "his present salary remains well below the average beginning salary for most professors at this University (as well as at other Universities in Tennessee and other states) with the same, and indeed, lesser qualifications, experience and credentials[.]" (<u>Id.</u>) According to Dr. Moore, all of these acts of discrimination constitute violations of the above enumerated federal and state laws. (<u>Id.</u>) He also claims that he has been "systematically denied support and graduate student assistants and assigned one of the largest teaching loads at the University, all under color of law and authority." (<u>Id.</u> ¶ 9.) With respect to President Raines's tenure specifically, Dr. Moore alleges that there has been a "deliberate and systematic deprivation of the Civil Rights of the plaintiff and other African-Americans, to equal access to jobs, pay, opportunities and promotion in the University and at the Fogelman College during her tenure[.]" (<u>Id.</u> ¶ 5.)

In his complaint, Dr. Moore requests relief for the injuries

which he has suffered and continues to suffer "due to and proximately caused by the acts and omissions of the Defendants over the twenty three years he has been employed at the University." (Id. ¶ 13.)  He seeks compensatory damages in the amount of $1,000,000 and a like amount of punitive damages.  He also requests that the court "enjoin the Defendants . . . to cease and desist discriminatory treatment and practices, conspiracy, retaliation, threats and the various other continual torts" and to remove Dean Grover and Provost Faudree from any form of supervision of Dr. Moore.  Finally, Dr. Moore asks the court to order "such other and further relief as it deems necessary and proper in these circumstances, including the award of attorney fees and costs."

On June 13, 2011, Dr. Moore filed an amended complaint retaining all allegations in the original complaint and adding allegations of retaliation against the Defendants.  In his amended complaint, Dr. Moore claims that he was subject to disparate treatment following the filing of his EEOC Discrimination Charge. (Pl.'s Am. Compl. ¶ 2.)  He alleges that he was singled out with "unprecedented scrutiny and supervision, to which no one similarly situated had ever [] been subjected, including but not limited to the following: the defendant(s), agents acting on behalf of the defendant(s) and his supervisors gave him assignments which involved a more difficult teaching work load and directed a graduate assistant student to begin to shadow him, concerning a

textbook, which he had been writing for several years and which was the subject of a misrepresentation by the defendant(s), in his quest for a raise and a promotion in 2009." (Id.) Dr. Moore claims that this disparate treatment "is aimed to humiliate and intimidate him, in a campaign of retaliation for the filing of the August EEOC filing" and that he "has suffered further and additional damage due to and proximately caused by the acts and omissions of the Defendants over the twenty four years he has been employed at the University and continues to suffer[.]" (Id. ¶¶ 4-5.) In his amended complaint, Dr. Moore requests additional relief, including compensatory damages in the amount of $650,000,000, a like amount of punitive damages, and the removal of any graduate assistant or anyone at the direction of Dean Grover and Provost Faudree to shadow or supervise Dr. Moore.

## C.  Motion for Summary Judgment

The University moves for summary judgment on all of Dr. Moore's claims. Specifically, the University argues that Eleventh Amendment sovereign immunity bars all of Dr. Moore's state and federal claims as against the University, except for those under Title VII, because the University is an agency of the State of Tennessee and has not consented to suit in federal court. Moreover, the University argues that it is not a "person" as defined by the federal civil rights statutes (§§ 1981, 1983, and 1985), and therefore cannot be sued for violations of those

-15-

statutes.  The University also claims that the §§ 1981, 1983, and 1985 claims are preempted by Title VII because this is a federal employment discrimination claim being brought under Title VII, and a § 1983 claim may only be brought simultaneously with a Title VII claim against a public employer when the § 1983 violation rests on a claim of infringement of rights guaranteed by the Constitution. With respect to Title VII discrimination, the University contends that Dr. Moore cannot demonstrate any Title VII violation because the University's decisions regarding Dr. Moore's salary, class assignment schedule, and promotion in rank application show that he was treated equally with his similarly situated colleagues.  As to retaliation, the University argues that the decision to utilize one textbook for all sections of Business Law does not equate to an "adverse action," and that there was a legitimate, non-discriminatory reason for the change – namely, to achieve consistency in the material taught both in on-line and on-ground classes.  The University asserts that there is "no proof or evidentiary support from which a trier of fact can find that Defendant's asserted reasons for the book change are pretextual and that retaliation motivated the book change."[8]

---

[8]The University also argues that Dr. Moore is not entitled to punitive damages against the University because 42 U.S.C. § 1981(b)(1) specifically precludes the recovery of punitive damages against government entities in civil rights suits.  In response to the University's motion, Dr. Moore concedes that there is no basis in his claims to seek punitive damages against the University. Thus, the parties agree that punitive damages are unavailable for

**D.  Dr. Moore's Response**

In response to the University's motion, Dr. Moore contends that the University is not a division or department of the State of Tennessee, but rather is a separate entity, managed and supervised by the Tennessee Board of Regents, and therefore should not be afforded protection under the Eleventh Amendment.  Dr. Moore also argues that prospective relief is a remedy pursuant to § 1983 which is not barred by the Eleventh Amendment.  With respect to his federal civil rights claims under §§ 1981, 1983, and 1985, Dr. Moore contests that Title VII is the exclusive remedy for his claims, and asserts liability by the University pursuant to the Fourteenth Amendment.  Dr. Moore argues that his claims of race discrimination should be left to the trier of fact.  He maintains that Dr. Jerry Turner is a similarly situated professor who was promoted near in time to Dr. Moore's application for promotion, thereby demonstrating a *prima facie* case of racial discrimination based on failure to promote.  Dr. Moore argues that the University's purported nondiscriminatory reason for not promoting him (i.e., his research and scholarly activity) was illegitimate, and that he can demonstrate that this reason was pretext for discrimination.  Dr. Moore also argues that his claims of discrimination based on unequal wages and unequal terms and conditions of employment should be reserved for the trier of fact.

---

Dr. Moore's claims against the University.

Finally, Dr. Moore contends that his retaliation claim should survive summary judgment because he has established a *prima facie* case of retaliation.

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009).  In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).  "The moving party bears the initial burden of production."  Palmer v. Cacioppo, 429 F. App'x 491, 495 (6th Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Once the moving party has met its burden, "the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 200 (6th Cir. 2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "[I]f the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmovant has the burden, the moving party is entitled to

summary judgment as a matter of law." Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001). "The central issue 'is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Palmer, 429 F. App'x at 495 (quoting Anderson, 477 U.S. at 251-52).

## B. Eleventh Amendment Sovereign Immunity

As an initial matter, the court notes that Dr. Moore has sued both the University and the Individual Defendants in their "official capacities." "Official-capacity suits represent only another way of pleading an action against an entity of which an officer is an agent." Everson v. Leis, 556 F.3d 484, 493-94 n. 3 (6th Cir. 2009) (internal citations and quotation marks omitted). "An official capacity suit is, in all respects other than the name, to be treated as a suit against the entity." Briner v. City of Ontario, 370 F. App'x 682, 699 (6th Cir. 2010) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985)) (internal quotation marks omitted); see also Moore v. City of Harriman, 272 F.3d 769, 776 (6th Cir. 2001) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office . . . as such, it is no different from a suit against the State itself.") (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)). The only exception to this general rule is when an individual is sued in his

or her official capacity for prospective injunctive relief to end a continuing violation of federal law by that official. Ex Parte Young, 209 U.S. 123, 159-60 (1908). "The Ex Parte Young exception . . . applies only when the lawsuit involves an action against state officials, not against the state." Elephant Butte Irrigation Dist. Of N.M. v. Dept. of the Interior, 160 F.3d 602, 607 (10th Cir. 1998). "[O]fficial-capacity actions for prospective relief are not treated as actions against the State." Kentucky v. Graham, 473 U.S. 159, 167 n. 14 (1985); see also Whitfield v. Tennessee, 639 F.3d 253, 257 (6th Cir. 2011) ("An Ex Parte Young action may be commenced only against a state official acting in her official capacity and may seek [only] prospective relief to end a continuing violation of federal law.") (internal quotation omitted). Insofar as Dr. Moore's complaint seeks to enjoin any of the Individual Defendants from continuing to violate federal law, those claims are not claims against the University and remain as claims against the Individual Defendants in their official capacities. Accordingly, they are addressed in the report and recommendation on the Individual Defendants' motion for summary judgment. All other claims against the Individual Defendants in their official capacities are claims against the University and are therefore addressed in this report and recommendation.

The Eleventh Amendment provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law

or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although the text of the Amendment refers only to suits against a State by citizens of another State, [the Supreme Court] has repeatedly held that an unconsenting State also is immune from suits by its own citizens." Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 446 (2004) (citing cases). "In addition to the states themselves, Eleventh Amendment immunity can also extend to departments and agencies of states." Mingus v. Butler, 591 F.3d 474, 481 (6th Cir. 2010) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)). "Eleventh Amendment immunity attaches only to defendants that are the state itself or an 'arm of the State.'" Town of Smyrna, Tenn. v. Mun. Gas Auth. Of Ga., No. 12-5476, 2013 WL 3762889, at *8 (6th Cir. July 19, 2013) (quoting Ernst v. Rising, 427 F.3d 351, 358 (6th Cir. 2005)). "The burden of establishing Eleventh Amendment immunity lies with the state[.]" Barker v. Goodrich, 649 F.3d 428, 432 (6th Cir. 2011) (citing Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 963 (6th Cir. 2002)). Courts have, however, recognized two exceptions to state sovereign immunity from suit in federal courts under the Eleventh Amendment (aside from the Ex Parte Young exception for suits against state officials): (1) when the state has consented to suit; and (2) when Congress has acted, pursuant to its Fourteenth Amendment

Enforcement Clause powers, to abrogate state sovereign immunity. See, e.g., Beil v. Lake Erie Corr. Records Dept., 282 F. App'x 363, 365 (6th Cir. 2008); S&M Brands, Inc. v. Cooper, 527 F.3d 500, 507 (6th Cir. 2008); Cox v. Shelby State Cmty. Coll., 48 F. App'x 500, 504 (6th Cir. 2002).

The parties dispute whether the University of Memphis is an agency of the State of Tennessee and therefore entitled to sovereign immunity. According to Tennessee statute, the University is part of Tennessee's established state university and community college system. T.C.A. § 49-8-101(a). Courts have consistently held that members of Tennessee's university system, including the University of Memphis in particular, are entitled to the State's Eleventh Amendment sovereign immunity. See Long v. Richardson, 525 F.2d 74, 79 (6th Cir. 1975) ("[The University of Memphis][9] is an institution to which the doctrine of sovereign immunity applies[.]"); see also Dotson v. State Technical Inst. of Memphis, Tenn., No. 97-5629, 1997 WL 777947, at *1 (6th Cir. Dec. 12, 1997); Dunn v. Spivey, No. 2:09-0007, 2009 WL 1322600, at *3 (M.D. Tenn. May 11, 2009); Giorgadze v. Tenn. Tech. Ctr., No. 06-CV-264, 2007 WL 2327034, at *4 (E.D. Tenn. Aug. 10, 2007); Henderson v. Sw.

---

[9]The decision in Long actually referred to "Memphis State University," which was the previous name of what is now the University of Memphis. See Gresham v. Memphis State University, No. 94-5225, 1995 WL 462432, at *1 n. 1 (6th Cir. Aug. 3, 1995) ("Memphis State University is now designated as the University of Memphis.")

<u>Tenn. Cmty. Coll.</u>, 282 F. Supp. 2d 804, 807 (W.D. Tenn. 2003); <u>Boyd v. Tenn. State Univ.</u>, 848 F. Supp. 111, 114 (M.D. Tenn. 1994). Thus, the court finds that the University of Memphis is an arm of the State of Tennessee and Eleventh Amendment sovereign immunity applies. Tennessee has not waived its sovereign immunity or consented to suit in this case. <u>See</u> T.C.A. § 20-13-102(b); <u>see also</u> <u>Wingo v. Tenn. Dept. of Corr.</u>, 499 F. App'x 453, 454 (6th Cir. 2012). Therefore, unless Congress has expressly abrogated state sovereign immunity for a particular claim, such claim should be dismissed.

## C. Federal Civil Rights Claims

Congress has not abrogated the states' sovereign immunity for claims pursuant to § 1981, § 1983, and § 1985, and courts have consistently held that the Eleventh Amendment bars claims pursuant to these statutes against non-consenting states. <u>See, e.g.</u>, <u>Sefa v. Kentucky</u>, 510 F. App'x 435, 437 (6th Cir. 2013) ("Congress has not abrogated state sovereign immunity under sections 1981 and 1983[.]"); <u>Sykes v. United States</u>, 507 F. App'x 455, 462 (6th Cir. 2012) ("All civil rights claims brought under 42 U.S.C. §§ 1983 and 1985 against the University of Cincinnati Medical Center are barred by Eleventh Amendment immunity."); <u>Walker v. Ohio Dept. Of Rehab. and Corr.</u>, 241 F. App'x 261, 265 (6th Cir. 2007) (plaintiff's claim against the Department of Rehabilitation and Correction under 42 U.S.C. § 1981 is barred by the state's Eleventh Amendment

immunity).  Therefore, Dr. Moore's § 1981 claim, § 1983 claim, and § 1985 claim are barred against the University and Individual Defendants in their official capacities by Eleventh Amendment sovereign immunity.[10]  See <u>McCoy v. Michigan</u>, 369 F. App'x 646, 653 (6th Cir. 2010).

**D.    State Law Claims**

The University also moves for summary judgment on all of Dr. Moore's state law claims on sovereign immunity grounds.  "[T]he doctrine of pendant jurisdiction does not override the Eleventh Amendment."  <u>Williams v. Com. of Ky.</u>, 24 F.3d 1526, 1543 (6th Cir. 1994).  "[A]s a general rule, the Eleventh Amendment bars state law claims against state employees in their official capacity, regardless of what type of relief is sought."  <u>Burton v. Durnin</u>, No. 3:11-CV-429, 2012 WL 946747, at *7 (E.D. Tenn. Mar. 20, 2012) (citing <u>Experimental Holdings, Inc. v. Farris</u>, 503 F.3d 514, 521 (6th Cir. 2007)).  Congress has not abrogated Tennessee's immunity so that tort claims may be filed against the State in federal court.  Nor has Tennessee consented to suit in federal court for tort claims brought under state law.  A state's waiver of Eleventh Amendment immunity in federal court must be explicit.

---

[10]The University also argues for dismissal of Dr. Moore's §§ 1981, 1983, and 1985 claims based on the argument that the University is not a "person" subject to suit under these statutes.  The University further argues that these federal civil rights claims are preempted by Title VII.  However, the court need not address these arguments, as the claims are barred by the Eleventh Amendment.

See <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 104 (1984).  "[W]hile Tennessee has consented to being sued in other forums such as the Tennessee Claims Commission, it has not consented to being sued in federal court for tort claims brought under state law." <u>Burton</u>, 2012 WL 946747, at *7.  In fact, the Tennessee Supreme Court has recognized that the State of Tennessee retains its immunity outside the Tennessee Claims Commission.  <u>See</u> <u>Stewart v. State</u>, 33 S.W.3d 785, 790 (Tenn. 2000).  Therefore, because Tennessee has not consented to being sued in federal court on the state law claims and Congress has not abrogated state immunity for such claims, the court recommends that all of Dr. Moore's state law claims be dismissed against the University and Individual Defendants in their official capacities.

**E. Title VII**

It is well established that "Congress acted validly under its Fourteenth Amendment Enforcement Clause powers to abrogate state sovereign immunity to Title VII claims." <u>Cox</u>, 48 F. App'x at 504-05 (citing <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445 (1976)); <u>see also</u> <u>Stewart, Jr. v. Va. Com. Univ.</u>, 414 F. App'x 555, 556 (4th Cir. 2011); <u>Nails v. Pa. Dept. Of Transp.</u>, 414 F. App'x 452, 455 (3d Cir. 2011); <u>Kooros v. Nicholls State Univ.</u>, 379 F. App'x 377, 379 n. 7 (5th Cir. 2010); <u>McCoy</u>, 369 F. App'x at 654; <u>Davis v. Jackson Cnty. Mun. Court</u>, No. 2:11-CV-00919, 2013 WL 1750472, at *5 (S.D. Ohio Apr. 23, 2013).  Thus, Dr. Moore's claims of Title VII discrimination and retaliation are not barred against the

University by the Eleventh Amendment.

"Title VII makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 561 (6th Cir. 2004); 42 U.S.C. 2000e-2(a)(1). Title VII also prohibits an employer from retaliating against an employee for opposing "any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "In order to establish a Title VII employment discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." Hick v. SSP Am., Inc., 490 F. App'x 781, 783 (6th Cir. 2012); Imwalle v. Reliance Med. Prods., 515 F.3d 531, 543-44 (6th Cir. 2008). "Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Kuhn v. Washtenaw Cnty., 709 F.3d 612, 624 (6th Cir. 2013) (citation and internal quotation marks omitted). When, as here, there is no direct evidence of discrimination, courts analyze both discrimination and retaliation claims under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973), to evaluate the claims.[11]  <u>Lott v. ICS Merill</u>, 483 F. App'x 214, 217 (6th Cir. 2012); <u>see also</u> <u>Fuhr v. Hazel Park Sch. Dist.</u>, 701 F.3d 668, 674 (6th Cir. 2013) ("Retaliation claims supported by circumstantial evidence are examined using the burden-shifting framework established in [<u>McDonnell Douglas</u>.]").  "Under this framework, the plaintiff bears the initial burden of making a prima facie showing of racial discrimination.  If he does, the burden of production (but not persuasion) shifts to the employer to articulate a legitimate, nondiscrimniatory reason for its actions, which the plaintiff may rebut by proving that the stated reason was pretextual."  <u>Lott</u>, 483 F. App'x at 217 (citation omitted).

The Sixth Circuit has explained that "on a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the <u>McDonnell Douglas</u> inquiry."  <u>Risch v. Royal Oak Police Dep't</u>, 581 F.3d 383, 390-91 (6th Cir. 2009) (internal quotation marks and citations omitted).  Under this framework, "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a *prima facie* case of discrimination."  <u>Blair v. Henry Filters, Inc.</u>, 505 F.3d 517, 524 (6th Cir. 2007), <u>abrogated on other grounds by</u> <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167 (2009).  Once a plaintiff establishes a *prima face* case of discrimination based on circumstantial evidence, the burden of

---

[11]Dr. Moore has not provided the court with any direct evidence of discrimination or racially motivated treatment.

production shifts to the defendant to articulate a legitimate, nondiscriminatory (or non-retaliatory) explanation for the adverse employment action. <u>Singfield</u>, 389 F.3d at 563. Should the defendant meet its burden of production, the burden shifts back to the plaintiff "to identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." <u>Blair</u>, 505 F.3d at 524; <u>see also</u> <u>A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.</u>, 711 F.3d 687, 697 (6th Cir. 2013) ("the burden shifts back to the Plaintiffs to 'prove by a preponderance of the evidence that the legitimate reasons offered by [the defendant] were not its true reasons, but were a pretext for' retaliation") (quoting <u>DiCarlo v. Potter</u>, 358 F.3d 408, 415 (6th Cir. 2004)); <u>Risch</u>, 581 F.2d at 391 (quoting <u>Blair</u>). "Pretext may be demonstrated if the proffered reason '(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" <u>Hawkins v. Memphis Light Gas and Water</u>, No. 11–6484, 2013 WL 1149738, at *3 (6th Cir. Mar. 20, 2013) (quoting <u>Dews v. A.B. Dick Co.</u>, 231 F.3d 1016, 1020–21 (6th Cir. 2000)). "Whichever method a plaintiff employs, he retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[ ] intentionally discriminated against him.'" <u>Id.</u> (quoting <u>Johnson v. Kroger Co.</u>, 319 F.3d 858, 866 (6th Cir. 2003)).

Dr. Moore bases his Title VII discrimination claims on

essentially two theories of discrimination: (1) failure to promote, and (2) ongoing disparate treatment, primarily with respect to his salary as well as the terms and conditions of his employment. He also claims that he was retaliated against for filing an EEOC charge for the aforementioned discriminatory treatment. Each claim will be analyzed in turn under the McDonnell Douglas framework.

1.  Failure to Promote

The University moves for summary judgment on Dr. Moore's claim of racial discrimination based on failure to promote. "To establish a *prima facie* case of racial discrimination on a failure to promote claim, [a plaintiff] must establish that: '(1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions.'" Nicholson v. City of Clarksville, Tenn., No. 12-6318, 2013 WL 3746098, at *10 (6th Cir. July 17, 2013) (quoting Dews, 231 F.3d at 1020-21). It is undisputed that Dr. Moore, as an African-American, is a member of a protected class, that he applied for promotion to Full Professor, and that he was considered for and denied the promotion. The University argues only that Dr. Moore cannot establish the *prima facie* case of discrimination because he cannot establish the fourth prong - that he had similar qualifications to an individual

who received the promotion from Associate to Full Professor.[12] Moreover, the University argues that even if Dr. Moore could demonstrate a *prima facie* case of discrimination, the University had a legitimate, non-discriminatory reason for declining to recommend Dr. Moore for promotion - namely, that his scholarship did not meet the requirements for promotion in rank. The University argues that Dr. Moore had not met the expectation of "an average of one publication per year since promotion to associate professor" in order to be promoted to Full Professor, and that Dr. Moore cannot establish that this reason for declining to promote him was pretext for discrimination.

Dr. Moore claims that he has established a *prima facie* case of race discrimination because he has identified a white professor, Dr. Turner, who was teaching in the same department as Dr. Moore and had comparable qualifications, but was granted a promotion from Associate to Full Professor around the same time that Dr. Moore's application was denied. While conceding that Dr. Turner published more articles between 2003 and 2008 than Dr. Moore published (which is the University's argument as to why Dr. Turner's qualifications

[12]The second element of the *prima facie* case requires that the plaintiff demonstrate that he was qualified for the promotion. While it appears that the Defendants, in denying Dr. Moore's application, ultimately determined that he was not qualified for promotion, the University does not argue in its motion that Dr. Moore does not meet the "qualified" element of his *prima facie* case. Moreover, because the evaluation of applications for promotion to Full Professor appears to be quite subjective, an analysis of Dr. Moore's individual qualifications is more appropriate at later stages of the analysis. <u>See</u> <u>White v. Columbus Metro. Hous. Auth.</u>, 429 F.3d 232, 242 n. 6 (6th Cir. 2005).

are not similar to Dr. Moore's), Dr. Moore argues that his teaching load was much greater than Dr. Turner's.  Dr. Moore has also presented evidence that he published 17 articles within his first thirteen years at the University, and has won several awards for his articles.  Moreover, Dr. Moore argues that the University's contention that the difference in the quality of scholarship separated the two candidates is misplaced, as the promotion to Full Professor was not a single position being sought and competed for by both candidates, but rather was a position available to both if each was deemed qualified.  Dr. Moore claims that the University "picks and chooses when to follow its own Rules," and that he can establish that he was more than qualified for promotion to Full Professor.  Dr. Moore further claims that the University's proffered reason for denying the promotion based on inadequate research and scholarly activity was pretextual, and that, at the Appeals Committee hearing, Dr. Moore's letters of recommendation for promotion were discounted, criticized, and omitted.

The court finds that Dr. Moore has provided sufficient evidence to create a genuine issue of material fact as to whether Dr. Turner is similarly qualified to Dr. Moore.  In a failure to promote claim, a plaintiff is not required to establish that he and his comparator had the exact same qualifications.  Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 814 (6th Cir. 2011).  Strengths and weaknesses of the comparators do not necessarily have to be in the same areas for the plaintiff to satisfy the fourth prong of the

*prima facie* case.  See id.  Both Dr. Moore and Dr. Turner were tenured Associate Professors in the School of Accountancy and applied for promotion to Full Professor in 2008.  While Dr. Turner published more articles (eight) than Dr. Moore (two) in the five-year period prior to their applications, Dr. Moore has provided evidence of his own strengths in other areas of evaluation.  Dr. Moore has presented evidence that several of the articles that he has published, including one from the five-year period prior to his application for promotion, have won awards.  Moreover, John Malloy, the Chair of the School of Accountancy Department, stated in his letter of recommendation for Dr. Moore that "the quality of [Dr. Moore's] articles outweighs the lack of numerous B publication."  Dr. Moore has also submitted evidence of strong recommendations from the School of Accountancy Department Tenure and Promotion Committee, the Fogelman College Tenure and Promotion Committee, and several outside professors of business law or legal studies.  (See ECF No. 41-4, Ex. A, Bates Nos. U of M 1142-1159.)  Dr. Moore had also been a tenured Associate Professor for a longer period of time than Dr. Turner prior to the applications for promotion.  Thus, the court finds that there is at least a genuine dispute of material fact as to whether Dr. Turner is similarly qualified to Dr. Moore.

Moreover, the court finds that there is at least a genuine dispute of material fact as to whether the University's proffered reason for not promoting Dr. Moore was pretext for discrimination. The University claims that Dr. Moore was not recommended for

promotion based on his inadequate scholarly activity and research. Dr. Moore, however, contends that while there is an *expectation* of an average of one publication per year after one becomes an Associate Professor, a failure to meet that expectation is not a bar to promotion to Full Professor. Dr. Moore further argues that the quality of his research and publications outweighs the quantity, and that he possessed sufficient research and scholarly activity. The Faculty Roles and Rewards Document, which governs the promotion and evaluation of faculty within the Fogelman College of Business, indicates that a candidate for Full Professorship must demonstrate a consistent flow of research activity, "normally expected to result in an average of one publication per year since promotion to Associate[.]" The Document further states, however, that "quality of scholarship is more important than mere quantity of publication" and that "fewer publications in top level outlets can reduce the number of publications expected for promotion." Accordingly, Dr. Moore has provided some evidence to suggest that a failure to meet the "one publication per year" expectation is not an absolute bar on promotion to Full Professor. Moreover, as stated earlier, Dr. Moore has presented evidence that he was both qualified and strongly recommended for promotion to the rank of Full Professor. The court thus finds that Dr. Moore has presented sufficient evidence that University's proffered reason for denying his promotion may not have actually motivated the decision to deny his promotion, or may have been insufficient to warrant a denial of

-33-

his application.  Thus, as Dr. Moore has created a genuine dispute of material fact as to pretext, the court recommends that the motion for summary judgment on Dr. Moore's Title VII discrimination based on failure to promote be denied.

2. <u>Disparate Treatment</u>

The Title VII prohibition against discrimination by an employer based on race "extends to disparate treatment, i.e. when an employer treats some employees 'less favorably than others because of their race.'" <u>Lott</u>, 483 F. App'x at 217 (quoting <u>Dunlap v. Tenn. Valley Auth.</u>, 519 F.3d 626, 630 (6th Cir. 2008)).  "To establish a *prima facie* case of discrimination, a plaintiff must show that [he]: (1) is a member of a protected class; (2) was qualified for the position or privilege; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated, non-protected employees." <u>Hatchett v. Health Care and Retirement Corp. of Am.</u>, 186 F. App'x 543, 547 (6th Cir. 2006). Dr. Moore contends that he has been treated differently than similarly situated, white professors by being paid a lower salary and by being given greater teaching loads with respect to hours taught and the total number of students.

a. *Wage Discrimination*

"The Supreme Court has held that pay disparities between a black employee and a similarly situated white employee can serve as the basis for a lawsuit under Title VII." <u>Bhaduri v. Summit Sec. Servs., Inc.</u>, No. 05 Civ. 7024(HB), 2006 WL 2290766, at *5

(S.D.N.Y. Aug. 8, 2006) (citing <u>Bazemore v. Friday</u>, 478 U.S. 385, 395-36 (1986)). "[T]he analysis of unequal pay for equal work is essentially the same under both the Equal Pay Act and Title VII." <u>Hicks v. Concorde Career Coll.</u>, 695 F. Supp. 2d 779, 791 (W.D. Tenn. 2010) (citing <u>Odomes v. Nucare, Inc.</u>, 653 F.2d 246, 250 (6th Cir. 1981)). In evaluating whether employees are similarly situated for purposes of resolving a wage discrimination claim under Title VII, the Sixth Circuit finds the relevant factors to include those aspects of the employment situation which must be examined in determining whether the plaintiff and a non-protected employee performed "equal work" as the term is defined by the Equal Pay Act ("EPA"). <u>Conti v. Universal Enters., Inc.</u>, 50 F. App'x 690, 699 (6th Cir. 2002). The relevant factors thus include the "skill, effort, and responsibilities of each job and the working conditions under which each job is performed." <u>Id.</u> "If a plaintiff establishes a *prima facie* case of wage discrimination under the EPA, an employer can establish an affirmative defense by showing that its compensation decision was based on (1) seniority; (2) merit; (3) a system which measures earnings by quantity or quality of production; or (4) any factor other than [race]." <u>Mallison v. Haworth, Inc.</u>, 488 F. App'x 88, 91 (6th Cir. 2012). "The employer bears the burden of establishing that its proffered explanation for the wage differential is true. If it does, the burden returns to the plaintiff to show that the employer's explanation is pretextual." <u>Id.</u> (internal citations omitted).

To establish his *prima facie* case, Dr. Moore compares his salary to the only other two Business Law professors who were employed in the School of Accountancy from 2007-2008: Dr. Mardis and Dr. Tankersley. Both Dr. Mardis and Dr. Tankersley were white Associate Professors of Business Law. Dr. Tankersley's salary for the 2008-2009 and 2009-2010 academic years was $66,947, Dr. Mardis's salary for 2007-2008 was $55,058, and Dr. Moore's salary was $54,097. To refute Dr. Moore's *prima facie* case, the University contends that the reason for the disparity between Dr. Tankersley's and Dr. Moore's salaries is that Dr. Tankersley had fourteen more years of experience and greater responsibilities than Dr. Moore, such as being the head of internships and an honors program. In response, Dr. Moore argues that the University has not cited evidence to verify its claim that Tankersley has greater teaching experience than Dr. Moore, and Dr. Moore has provided evidence that he has been teaching for forty years. Dr. Moore also cites statistics from the Association to Advance Collegiate Schools of Business ("AACSB"), the accrediting agency for the University and all other major business schools, which show that the average salary for Associate Business Law Professors is $88,300, with the lowest 10% being paid an average of $66,800.[13] Dr. Moore has also

---

[13]Based on the document submitted by Dr. Moore, it appears that the average salary for an Associate Professor in Business Law in 2009-2010 was actually $83,700 for public accredited colleges, $70,700 for public non-accredited schools, and $82,700 for all public schools. The salaries of the lowest 10% of professors for those three categories was listed as $66,900, $61,300, and $65,800, respectively. These discrepancies appear to be insubstantial,

presented evidence that he is the lowest paid Associate Professor in the entire Fogelman College of Business.

The court finds that Dr. Moore has presented sufficient evidence to survive summary judgment. First, Dr. Moore has at least created a genuine issue of fact as to his *prima facie* case of wage discrimination. Dr. Moore has presented evidence which demonstrates that two other similarly situated white faculty members were paid more than him. Dr. Tankersley is an Associate Professor of Business Law in the School of Accountancy, as was Dr. Mardis before she retired in 2008. As professors of the same rank teaching the same subject within the School of Accountancy, the positions of Dr. Moore, Dr. Tankersley, and Dr. Mardis all presumably required similar skills, effort, responsibilities, and working conditions. However, Dr. Mardis was paid about $1,000 more than Dr. Moore in 2007-2008, and Dr. Tankersley was paid nearly $13,000 more than Dr. Moore. Accordingly, Dr. Moore has provided sufficient evidence to satisfy the *prima facie* case for Title VII wage discrimination at the summary judgment stage.

The University has not provided any reason for why Dr. Mardis's salary was greater than Dr. Moore's. Therefore, the University has failed to meet its burden of providing a legitimate, nondiscriminatory reason for the wage differential between Dr. Mardis and Dr. Moore. With respect to Dr. Tankersley, the

_____

however, and have little effect on Dr. Moore's apparent point that he was paid well below the average for the bottom 10% of Business Law professors across the country.

University has proffered a legitimate, nondiscriminatory reason for the salary differential - that Dr. Tankersley has been at the University for fourteen years longer than Dr. Moore. However, Dr. Moore has presented some evidence to create a genuine issue of fact as to whether the University's proffered reason is pretextual. Dr. Moore argues that his overall teaching experience is forty years, and that if salaries were based on number of years employed, he would not be the lowest paid professor in the Fogelman College of Business. While it appears that Dr. Moore may have misunderstood the University's argument - that Dr. Tankerlsey is paid more because he has greater seniority *at the University*, as opposed to a greater total amount of teaching experience - the court finds that Dr. Moore has nevertheless presented a genuine dispute of fact as to whether Dr. Tankersley's longer duration at the University and "additional duties" were sufficient to warrant a $13,000 difference in salary. Moreover, Dr. Moore argues that he has contributed much more to the University in the form of scholarly activity and research than Dr. Tankersley, who Dr. Moore claims is unpublished. The University has also failed to provide the court with any evidence to show how salaries are determined, how tenure at the University factors into those determinations, or what factors are considered in establishing an Associate Professor's salary. While the longer tenure at the University may be a legitimate nondiscriminatory reason for paying Dr. Tankersley a greater salary, a reasonable jury could find that this proffered

reason was not the actual motivation for the salary differential, or that it is insufficient to justify a $13,000 difference in salary. Therefore, the court recommends that the University's motion for summary judgment on Dr. Moore's Title VII disparate treatment claim based on unequal wages be denied.

### b. Unequal Terms and Conditions of Employment

The court recommends that Dr. Moore's Title VII claims of disparate treatment based on his assigned teaching loads, benefits, and other employment conditions be dismissed. Dr. Moore has failed to sufficiently establish a *prima facie* case of discrimination based on the terms and conditions of his employment. While he claims that, in addition to his denied promotion in 2009, white professors have consistently been compensated with more benefits, promotions, and raises, and overall better conditions of employment, he has presented no evidence in support of these allegations. Aside from his failure to promote claim and the evidence supporting his unequal salary, the only allegation which Dr. Moore attempts to support with factual evidence is the allegation that he has been given heavier teaching loads and assignments than comparable white professors.[14] However, there is

---

[14]While Dr. Moore argues that, in addition to credit hours assigned, he has also been given classes with much greater numbers of students, he has failed to present any evidence to support this contention. Thus, Dr. Moore's allegation regarding disparate class sizes and numbers of students fails to satisfy the *prima facie* case of discrimination because he has not provided any evidence that he was required to teach more students than other similarly situated professors.

no evidence in the record which shows disparate or discriminatory treatment based on workloads. In fact, the record shows that in recent years, Dr. Tankersley, in addition to other faculty members in the School of Accountancy, have been assigned teaching loads that have been equal to, if not greater than, the numbers of credit hours that have been assigned to Dr. Moore. Dr. Moore has consistently taught "9 and 9" for the past several years, which is the same as Dr. Tankersley's teaching load from 2008-2009, and also the same as three other School of Accountancy faculty members in 2008-2009. Thus, Dr. Moore has failed to show that a similarly situated professor was treated differently than him with respect to class assignments. Because Dr. Moore has failed to make a *prima facie* showing of discrimination based on the terms and conditions of his employment, the court recommends that the University's motion for summary judgment be granted on those claims.

   3. <u>Retaliation</u>

   To establish a *prima facie* case of retaliation, Dr. Moore must demonstrate that: (1) he engaged in protected activity; (2) which was known to his employer; (3) he suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. <u>See</u> <u>Wasek v. Arrow Energy Servs., Inc.</u>, 682 F.3d 463, 468-69 (6th Cir. 2012); <u>Little v. BP Exploration & Oil Co.</u>, 265 F.3d 357, 363 (6th Cir. 2001). "Under Title VII, there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity

Commission . . . and opposition to an apparent Title VII violation." Wasek, 682 F.3d at 469. To establish a causal connection between a protected activity and an adverse employment action by his employer, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in the protected activity. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000); see also Newton v. Ohio Dept. of Rehab. and Corr. - Toledo Corr. Inst., 496 F. App'x 558, 567 (6th Cir. 2012).

Dr. Moore claims that the University, or its agents, retaliated against him after they became aware of his EEOC Discrimination Charge, which was filed on August 12, 2009. In his EEOC Retaliation Charge, Dr. Moore alleges that the University retaliated against him by having Charlene Spiceland, a non-supervisory official, choose a new textbook for him to use in teaching his Business law classes, and, in doing so, denied him his "academic instructional freedom." In his amended complaint, Dr. Moore goes further to claim that he has been subjected to "unprecedented scrutiny" after his EEOC Discrimination Charge. He alleges that the University's agents have given him assignments which involve a more difficult teaching workload, and that the University, through its agents, directed a graduate assistant student to begin to shadow him, concerning a textbook which he had been writing for several years and which was the subject of a misrepresentation by the defendant(s) during his application for

promotion to Full Professor. Dr. Moore claims that this retaliatory and disparate treatment "is aimed to humiliate and intimidate him, in a campaign of retaliation" for the August EEOC filing.

It is undisputed that Dr. Moore has met the first two prongs of the *prima facie* case for a Title VII retaliation claim. He engaged in a protected activity by filing his Discrimination Charge with the EEOC, and the University admits that it was aware of the EEOC charge. The University contests, however, Dr. Moore's assertion that he can satisfy the third and fourth prongs. According to the University, "the evidence reflects that Defendant made a decision to use one textbook for all sections of Business Law classes . . . being taught in Spring 2011." The University argues that this does not constitute an "adverse action" and that there is no evidence to support Dr. Moore's claim that the change was a retaliatory action. Moreover, the University contends that it had a legitimate, non-discriminatory reason for changing the textbook, which was to assure consistency in the material taught both in on-line and on-ground classes. For these reasons, the University argues that it is entitled to summary judgment on Dr. Moore's retaliation claim. The court agrees.

"An adverse employment action has been defined as 'a materially adverse change in the terms and conditions of [a plaintiff's] employment.'" <u>Spees v. James Marine, Inc.</u>, 617 F.3d 380, 391 (6th Cir. 2010) (quoting <u>White v. Burlington N. & Santa Fe</u>

Ry. Co., 364 F.3d 789, 795 (6th Cir. 2004)). "An adverse employment action is an action by the employer that constitutes a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Hicks v. Concorde Career Coll., 449 F. App'x 484, 487 (6th Cir. 2011) (quoting White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008)) (internal quotation marks omitted). "A 'bruised ego' or a 'mere inconvenience or alteration of job responsibilities' is not sufficient to constitute an adverse employment action." Spees, 617 F.3d at 391 (quoting Burlington, 364 F.3d at 797). The alleged adverse action must be materially adverse such that it "would have dissuaded a reasonable worker from filing a charge of discrimination." Finley v. City of Trotwood, 503 F. App'x 449, 454 (6th Cir. 2012).

The actions alleged by Dr. Moore are _de minimus_ at best and do not constitute materially adverse actions. See Choulagh v. Holder, No. 12-1957, 2013 WL 2249459, at *6 (6th Cir. May 22, 2013). Requiring a professor to use a new textbook and having a graduate assistant shadow him are, at most, mere inconveniences. See Choulagh, 2013 WL 2249459, at *6 (placement of the plaintiff on a performance improvement plan and non-satisfactory work reviews do not rise to the level of a materially adverse action); Finley, 503 F. App'x at 454 (exclusion from meetings, weekly activity reports, criticism, and refusal to fund job-related training are not

-43-

materially adverse actions). "None of the alleged retaliatory acts [] resulted in a decrease in salary, a less distinguished title, or a loss of benefits." Choulagh, 2013 WL 2249459, at *6. Therefore, the court finds that Dr. Moore has not provided sufficient evidence from which a reasonably jury could find that he suffered a materially adverse employment action.

The court also finds that Dr. Moore has failed to provide any evidence of a causal link between the University's decision to change his textbook and the filing of his EEOC charge. Dr. Moore's only argument for a causal link, aside from his subjective belief, is the fact that the change occurred subsequent to his EEOC Discrimination Charge, and near in time to his receipt of the Right to Sue letter. The Sixth Circuit has held that temporal proximity alone is usually insufficient to establish a causal connection. Paasewe v. Action Grp., Inc., No. 12-3702, 2013 WL 3722090, at *5 (6th Cir. July 17, 2013). However, the Sixth Circuit has also recognized the possibility that, "on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive[.]" Id. (quoting Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 401 (6th Cir. 2010)) (quotation marks omitted); see also Nicholson, 2013 Wl 3746098, at *12 ("[A] prima facie case based on temporal proximity alone requires a short period of time between the protected activity and the adverse employment action, 'usually less than six months.'") (quoting Nguyen, 229 F.3d at 567); Mickey v. Zeidler Tool & Die Co., 516

-44-

F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."). The facts of this case do not show such "extremely close" temporal proximity to satisfy the causal link prong of the *prima facie* case. The record shows that the University was made aware of Dr. Moore's EEOC Discrimination Charge some time prior to September 4, 2009, as that is the date by which the EEOC's "Notice of Charge of Discrimination" instructed the University to respond to Dr. Moore's Discrimination Charge with a statement of the University's position. (See ECF No. 40-7, Ex. D, pg. 10.) The e-mail sent to Dr. Moore by Spiceland to inform him of the textbook change was not sent until October 22, 2010 - more than a year later. Thus, the court finds that Dr. Moore has failed to satisfy the fourth prong of a *prima facie* case of Title VII retaliation, and recommends dismissal of Dr. Moore's retaliation claim.

### III. RECOMMENDATION

For the above reasons, the court recommends that the University's Motion for Summary Judgment be denied as to Dr. Moore's Title VII claims of discrimination based on failure to promote and wage discrimination, and granted as to all other claims.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

August 16, 2013
Date

**NOTICE**

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, A PARTY MAY SERVE AND FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. A PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FED. R. CIV. P. 72(b)(2). FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**